## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

------------------------------------------------------- x

RAJEEYAH WILSON, STALIN JAVIER
EUSEBIO and NANCY L. PATNUDE, on
behalf of themselves and all others similarly
situated,

               Plaintiffs,

      v.

SMARTFOODS, INC., and PEPSICO, INC.,

          Defendants.

------------------------------------------------------- x

CASE NO. 1:24-cv-12814

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Rajeeyah Wilson, Stalin Javier Eusebio, and Nancy L. Patnude (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, bring this Class Action Complaint against Defendants Smartfoods, Inc., ("Smartfoods") and PepsiCo, Inc. ("PepsiCo") (collectively, "Defendants"), based upon personal knowledge as to themselves, and upon information, investigation, and belief of their counsel.

## SUMMARY OF THE ACTION

1. This class action seeks to challenge Defendants' false and deceptive practices in the marketing and sale of two of its "Smartfood" popcorn products: (1) Smartfoods White Cheddar Popcorn, and (2) Smartfoods Movie Theater Butter Popcorn (collectively, the "Products").

2. Specifically, the use of the phrases "No Artificial Flavors" and "No Artificial Preservatives" on the front label of the Products, leads reasonable consumers to believe that the

1

Products contain no ingredients which are artificial flavors or preservatives. However, these practices are false and misleading because the Products contain maltodextrin, a highly processed and synthetic ingredient, which is both a preservative and a flavoring agent.

3.      Plaintiffs and Class members have reasonably relied on Defendants' deceptive labeling and advertising of the Products, reasonably believing that the Products do not contain artificial flavors or artificial preservatives.

4.      Plaintiffs and Class members purchased the Products and paid a premium price based on Defendants' advertising of the Products as made with "No Artificial Flavors" and "No Artificial Preservatives," which is seen as a premium as consumers seek to avoid artificial flavors and preservatives in their foods. Had Plaintiffs and Class members been aware of the truth about the Products, they would not have purchased them, or would have paid significantly less for them. Accordingly, Plaintiffs and Class members have been injured by Defendants' deceptive business practices.

5.      Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated. Plaintiffs seek to represent an Illinois Class, a New York Class, and a California Class (collectively referred to as the "Classes").

## PARTIES

### I.      Plaintiffs

6.      Plaintiff Rajeeyah Wilson is a citizen of Indiana and currently resides in Fort Wayne, Indiana. Ms. Wilson frequently travels to and from Chicago, and on numerous occasions during her trips, she purchased the Products in Chicago. In particular, around September 2024, Ms. Wilson purchased the "Smartfoods White Cheddar Popcorn" Product from a Falcon Fuel gas station in Chicago, Illinois. In purchasing the Product, Ms. Wilson saw

2

and relied on the phrases "No Artificial Flavors," and "No Artificial Preservatives" on the front label of the Product. Based on these representations, Ms. Wilson believed she was purchasing a popcorn made as represented, with no artificial flavors or preservatives. However, unbeknownst to Ms. Wilson, the Product she purchased contained maltodextrin, a highly processed and synthetic ingredient that is both an artificial flavor and an artificial preservative. Had she known that the Product contained maltodextrin she would not have purchased the Product or would have paid substantially less for it. Therefore, Ms. Wilson suffered injury in fact and lost money as a result of Defendants' misleading, false, unfair, and fraudulent practices, as described herein.

7. Plaintiff Stalin Javier Eusebio is a citizen of New York and currently resides in New York, New York. In September 2024, Mr. Eusebio purchased the "Smartfoods White Cheddar Popcorn" Product from St Nicholas Deli in New York, New York. In purchasing the Product, Mr. Eusebio saw and relied on the front label of the Product. Specifically, Mr. Eusebio saw and relied on the phrases "No Artificial Flavors," and "No Artificial Preservatives" on the front label of the Product. Based on these representations, Mr. Eusebio believed he was purchasing a popcorn made as represented, with no artificial flavors or preservatives. However, unbeknownst to Mr. Eusebio, the Product he purchased contained maltodextrin, a highly processed and synthetic ingredient that is both an artificial flavor and an artificial preservative. Had he known that the Product contained maltodextrin, he would not have purchased the Product or would have paid substantially less for it. Therefore, Mr. Eusebio suffered injury in fact and lost money as a result of Defendants' misleading, false, unfair, and fraudulent practices, as described herein.

8.     Plaintiff Nancy L. Patnude is a citizen of California and currently resides in Merced, California. In November 2024, Ms. Patnude purchased the "Smartfoods White Cheddar Popcorn" Product from her local Save Mart in Merced, California. In purchasing the Product, Ms. Patnude saw and relied on the front label of the Product. Specifically, Ms. Patnude saw and relied on the phrases "No Artificial Flavors," and "No Artificial Preservatives" on the front label of the Product. Based on these representations, Ms. Patnude believed she was purchasing a popcorn made as represented, with no artificial flavors or preservatives. However, unbeknownst to Ms. Patnude, the Product she purchased contained maltodextrin, a highly processed and synthetic ingredient that is both an artificial flavor and an artificial preservative. Had she known that the Product contained maltodextrin, she would not have purchased the Product or would have paid substantially less for it. Therefore, Ms. Patnude suffered injury in fact and lost money as a result of Defendants' misleading, false, unfair, and fraudulent practices, as described herein.

9.     Despite Defendants' misrepresentations, Plaintiffs would purchase the Products, as advertised, if they were in fact composed free from artificial flavors and artificial preservatives. Although Plaintiffs regularly shop at stores which carry the Products, absent an injunction on Defendants' deceptive advertising, they will be unable to rely with confidence on Defendants' labeling of the Products in the future. Furthermore, while Plaintiffs currently believe the Products are falsely and deceptively labeled, they lack personal knowledge as to Defendants' specific business practices, as they will not be able to determine whether the Products will truly contain no artificial preservatives and no artificial flavors in the future. This leaves doubt in their mind as to the possibility that at some point in the future the Products could be made in accordance with the representation on the front labels. This uncertainty,

coupled with their desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendants from making the alleged misleading representations. In addition, other consumers will continue to purchase the Products, reasonably but incorrectly, believing that they are made without artificial preservatives and flavors.

## II.    Defendants

10.    Defendant Smartfoods, Inc. is a Delaware corporation and maintains its headquarters in Plano, Texas. Smartfoods, on its own and through its agents, is responsible for the formulation, ingredients, manufacturing, naming, advertising, marketing, and sale of the Products in the United States, including in Illinois, New York and California, and specifically in this District.

11.    Defendant PepsiCo, Inc. is a Delaware corporation and maintains its headquarters in Purchase, New York. PepsiCo, on its own and through its agents, is responsible for the formulation, ingredients, manufacturing, naming, advertising, marketing, and sale of the Products in the United States, including in Illinois, New York and California, and specifically in this District.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d) in that: (1) this is a class action involving more than 100 Class members; (2) the parties are minimally diverse, as members of the proposed class are citizens of states different than Defendants' home states; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

13.     This Court has personal jurisdiction over Defendants because they conduct and transact substantial business in Illinois, and intentionally and purposefully placed the Products into the stream of commerce within Illinois.

14.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Ms. Wilson's claims occurred in this judicial District. Namely, Ms. Wilson purchased one of the Products in this judicial District.

## **FACTUAL BACKGROUND**

15.     Smartfoods is one of the most well-known producers of ready to eat popcorn food products in the U.S.[1]

16.     Defendants, directly and/or through its agents, formulated, manufactured, labeled, marketed, distributed and sold the Products across the United States. The Products are sold through third-party retailers, including, but not limited to, Target, Amazon.com, Costco, Albertsons, and Ralphs.

17.     During the relevant statute of limitations period, Defendants sold the Products labeled, marketed, sold with the label "No Artificial Colors or Flavors" and "No Artificial Preservatives" but the Products contain maltodextrin, a highly processed ingredient. Maltodextrin is so highly processed that the ingredient is considered artificial. So much so, that even federal regulations recognize it as synthetic. *See* 72 Fed. Reg. 62149, 62166 (proposed Nov. 2, 2007).

18.     Maltodextrin is not found in nature. Instead, it is produced by a variety of synthetic processes including, but not limited to, industrially produced by a process called hydrolysis.

---

[1] "The ready-to-eat popcorn category shows no signs of fizzling, said Fauzia Haq, senior director of marketing at PepsiCo, Inc. Leading the competitive snacking segment is PepsiCo's Smartfood brand, which captured a nearly 40% market share in the past year, according to the data from Information Resources, Inc. (I.R.I.)." Monica Watrous, FOOD BUSINESS NEWS¸ April 9, 2018, *The Trends Driving Smartfood's Popcorn Category Leadership*, https://www.foodbusinessnews.net/articles/11613-the-trends-driving-smartfoods-popcorn-category-leadership (last visited, Dec. 11, 2024).

Hydrolysis is a common form of a chemical reaction where water is mostly used to break down the chemical bonds that exist between a particular substance.

19.     For maltodextrin, starch from foods such as corn, rice, potato, or wheat, undergo a process through partial hydrolysis, which involves cooking the starch at a very high temperature and mixing it with enzymes or acids until they are broken down into a white powder.  This process breaks down the long chains of glucose molecules into shorter chains.

20.     The resulting white water-soluble powder can vary in sweetness depending on the degree of polymerization. The degree of polymerization refers to the number of glucose units in the molecule; a lower degree results in a sweeter product. The degree of sweetness (taste intensity) decreases as the average chain length of the maltodextrin increases (that is, as the dextrose equivalent[2] value decreases).[3]

21.     In basic terms, maltodextrin is used to impart a sweet flavor into a food product. This is because maltodextrin can be used instead of sugar since the two share similar properties.[4]

22.     Consumption of manufactured maltodextrin has been associated with adverse health events like spikes in blood sugar, gastrointestinal symptoms such as cramping and bloating, and causing intestinal disorders by aiding the bacteria known to hurt the intestine.[5] Moreover, research has identified several health issues including cancer, Alzheimer's disease,

---

[2] "Dextrose equivalent (DE) is a measure of the amount of reducing sugars present in a sugar product, expressed as a percentage on a dry basis relative to dextrose (glucose)." https://en.wikipedia.org/wiki/Dextrose_equivalent (last visited, Dec. 11, 2024).

[3] James N. BeMiller, *Carbohydrate and Noncarbohydrate Sweeteners*, CARBOHYDRATE CHEMISTRY FOR FOOD SCIENTISTS (Third Edition), 2019, Pages 371-399, available at https://www.sciencedirect.com/science/article/abs/pii/B9780128120699000194 (last visited, Dec. 11, 2024).

[4] Hofman DL, van Buul VJ, Brouns FJPH. *Nutrition, Health, And Regulatory Aspects Of Digestible Maltodextrins*. CRIT REV FOOD SCI NUTR. 2016;56(12):2091-2100.

[5] Karthik Kumar, MBBS, *What is Maltodextrin, and Is It Bad for You?*, MEDICINENET, June 6, 2024, https://www.medicinenet.com/what_is_maltodextrin_and_is_it_bad_for_you/article.htm (last visited, Dec. 11, 2024).

kidney damage, reproduction difficulties, and allergies that can be caused due to maltodextrin produced from genetically modified corn.[6]

23.     For commercially produced maltodextrin, the chemical method, i.e. acid hydrolysis, is the most common modification because it can be readily and easily controlled in comparison to enzymatic hydrolysis.[7]

24.     The United States Food and Drug Administration ("FDA") defines the term chemical preservative as: "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. § 101.22.

25.     Several academic journals have noted the use of maltodextrin as a preservative.[8] Indeed, "by reducing water activity, maltodextrin inhibits the growth of microorganisms and extends the shelf life of processed foods."[9],[10] Maltodextrin acts as a preservative in many

---

[6] *Id.*

[7] Enzymatic hydrolysis can also produce artificial maltodextrin. Research has shown that "enzymatic hydrolysis of chemically modified starches leads to the production of chemically modified maltodextrins." Monica Rosa Loizzo, *Chemically Modified Starches as Food Additives*, MOLECULES, 2023 Nov 11;28(22):7543, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC10672975/, (last visited, Dec. 11, 2024).

[8] Mine Ozcelik, Ulrich Kulozik, *The Role of Maltodextrin Concentration in Maintaining Storage Stability of Dried Fruit Foams Texturized Using Plant Protein–Polysaccharide Blends*, FOODS 2023, *12*(8), 1673, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10137890/, (last visited, Dec. 11, 2024); Ida I. Muhamad, Hong L. Lian, *Chapter 15 - Advanced Natural Food Colorant Encapsulation Methods: Anthocyanin Plant Pigment*, NATURAL AND ARTIFICIAL FLAVORING AGENTS AND FOOD DYES, , 2018, available at https://www.sciencedirect.com/science/article/abs/pii/B9780128115183000156, (last visited, Dec. 11, 2024); Sabina Lachowicz, , Anna Michalska-Ciechanowska, and JanOszmianski, *The Impact of Maltodextrin and Inulin on the Protection of Natural Antioxidants in Powders Made of Saskatoon Berry Fruit, Juice, and Pomace as Functional Food Ingredients*, MOLECULES. 2020 Apr 15;25(8):1805, *available at* https://pubmed.ncbi.nlm.nih.gov/32326580/, (last visited, Dec. 11, 2024).

[9] Understanding Maltodextrin: The Food and Beverage Filler, https://www.capecrystalbrands.com/blogs/cape-crystal-brands/understanding-maltodextrin-the-food-and-beverage-filler (last visited, Dec. 11, 2024).

[10] "Reduction of water activity in foods prevents the growth of vegetative microbial cells, germination of spores, and toxin production by molds and bacteria." Osman Erkmen, T. Faruk Bozoglu, *Food Preservation by Reducing Water Activity*, *available at* https://onlinelibrary.wiley.com/doi/10.1002/9781119237860.ch30.

processed foods, keeping them fresh.[11] It does this by slowing or helping prevent the formation of bacteria, mold, yeast, and fungus.[12]

26. Maltodextrin is thus an artificial preservative in the Products, regardless of whether Defendants intended to use them as preservatives. Thus, the representation that the Products contain no artificial preservatives is literally false, regardless of Defendants' intent in adding it into the Products. *See* 21 C.F.R. §101.22(a)(5) (defining preservatives as "any chemical that, when added to food, tends to prevent or retard deterioration"); *see also* Merriam-Webster's Dictionary (defining "preservative" as "something that preserves *or has the power of preserving*.")[13] (emphasis added).

27. Based on the forgoing allegations, maltodextrin is an artificially produced ingredient that retards the deterioration of consumer products. Therefore, Defendants use maltodextrin that is an artificial chemical preservative in the Products.

28. Through false and deceptive naming and marketing practices, Defendants have misled consumers regarding the ingredients used in the Products.

29. As an example, below is the front of the packaging for the Smartfood White Cheddar Product:

---

[11] "In addition to adding bulk, food additives like maltodextrin help to preserve food's taste, appearance, and texture. Maltodextrin helps preserve food and extend shelf life by maintaining moisture levels." Rebecca Valdez, MS, RDN, *What Is Maltodextrin Used For, and Is It Safe?*, https://www.verywellhealth.com/maltodextrin7481887#:~:text=In%20addition%20to%20adding%20bulk%2C%20food%20additives%20like,and%20extend%20shelf%20life%20by%20maintaining%20moisture%20levels.
[12] Understanding Maltodextrin: The Food and Beverage Filler, https://www.capecrystalbrands.com/blogs/cape-crystal-brands/understanding-maltodextrin-the-food-and-beverage-filler (last visited, Dec. 11, 2024).
[13] *Preservative*, MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/preservative?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited, Dec. 11, 2024).



30.     Based on the example above, reasonable consumers, including Plaintiffs are led to believe that the Product is made without any artificial flavors or artificial preservatives, especially when the Product explicitly represents this on the front label.

31.     Reasonable consumers, and Plaintiffs, understand the term artificial based on common parlance, such that "artificial' means "made by people."[14]

32.     In reality, however, the Products contain maltodextrin a highly processed ingredient which may have negative harmful effects on one's health. For example, maltodextrin

---

[14] Cambridge English Dictionary, s.v. "artificial," https://dictionary.cambridge.org/us/dictionary/english/artificial (last visited, Dec. 11, 2024).

may affect the balance of bacteria in the gut. One recent study "suggests that people who consume maltodextrin may have a reduced number of good bacteria and an increased quantity of harmful bacteria. This could potentially lead to intestine damage and a higher risk of inflammatory bowel diseases."[15]

33.     The false perception that the Products do not contain artificial flavors or artificial preservatives is material to consumers' purchasing decisions because products that actually do not contain artificial flavors or preservatives are universally seen as a premium.[16]

34.     Reasonable consumers, and Plaintiffs, understand the term preservative based on common parlance, such that "preservative" means "a chemical used to stop food from decaying."[17]

35.     The "No Artificial Flavors" and "No Artificial Preservatives" statements on the labels of the Products are material to reasonable consumers. These statements impliedly (if not explicitly) claim that the product is "free from" artificial flavors and artificial preservatives. "[F]oods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health … 84 percent of American consumers buy free-from foods because they are seeking out more natural or less processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent).

---

[15] Karthik Kumar, MBBS, *What Is Maltodextrin, And Is It Bad For You?*, MEDICINENET, June 6, 2024, https://www.medicinenet.com/what_is_maltodextrin_and_is_it_bad_for_you/article htm (last visited, Dec. 11, 2024).

[16] Elizabeth Crawford, *Meeting Consumer Demand For "Simple" Isn't As Simple As It Appears, But It Is Possible, Mintel Says*, FOODNAVIGATOR, Aug. 1, 2016, updated Sep. 28, 2021, https://www.foodnavigator-usa.com/Article/2016/08/02/Meeting-consumer-demand-for-simple-isn-t-simple-Mintel-says (last visited, Dec. 11, 2024).

[17] Cambridge English Dictionary, s.v. "preservative," https://dictionary.cambridge.org/us/dictionary/english/preservative (last visited, Dec. 11, 2024).

11

Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent)."[18]

36.     Recent published consumer research[19] surveying over 400 consumers concluded: "The significance of naturalness has crucial meaning for consumers nowadays. They prefer food free from preservatives, additives or artificial ingredients for perceived naturalness of foods."

37.     Persons, like Plaintiffs herein, have an interest in purchasing products that do not contain false and misleading claims with regards to the contents of the Products.

38.     As the entity ultimately responsible for the formulation, manufacturing, naming, labeling, advertising, and sale of the Products, Defendants are responsible for the accuracy of the information conveyed about the Products, including in their naming, labeling, and marketing.

39.     Defendants knew or should have known that naming and marketing of the Products as containing "No Artificial Flavors" and "No Artificial Preservatives," is deceptive, and that reasonable consumers would believe that the Products did not contain artificial flavors or artificial preservatives.

40.     On information and belief, Defendants employ professional chemists to create the chemical formulas of the Products, therefore, Defendants through their employees knew or should have known that maltodextrin is an ingredient which retards the deterioration of food products and are therefore chemical preservatives, and that maltodextrin is a flavoring agent.

---

[18] *84% of Americans buy "free-from" foods because they believe them to be more natural or less processed*, Mintel (Sept. 3, 2015), *available at* https://www.mintel.com/press-centre/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed/(last visited, Dec. 11, 2024).
[19] Paulina Guzik, Consumer Attitudes Towards Food Preservation Methods, Foods 2022, available at https://www.mdpi.com/2304-8158/11/9/1349, (last visited, Dec. 11, 2024).

41. By making false and misleading claims about the contents of its Products, Defendants impaired Plaintiffs' ability to choose the type and quality of products they chose to buy.

42. Plaintiffs and other consumers were injured by the foregoing deceptive advertising because they paid a premium for the Products based on the false perception that the Products did not contain any artificial flavors or preservatives. Had Plaintiffs and other consumers known the Products were made with maltodextrin, a highly processed and synthetic ingredient, they would have purchased a different product, or paid significantly less for the Products. As such, Plaintiffs and members of the putative Classes have been injured.

## CLASS DEFINITIONS AND ALLEGATIONS

43. Plaintiffs bring this matter on behalf of themselves and those similarly situated. Pursuant to Rule 23 of the Federal Rules of Civil Procedure (the "Rules" or "Rule"), Plaintiffs seek to represent the following classes:

> All residents of Illinois who purchased the Products within the applicable statute of limitation period ("Illinois Class").

> All residents of New York who purchased the Products in New York within the applicable statute of limitation period ("New York Class").

> All residents of California who purchased the Products within the applicable statute of limitations period ("California Class").

> All residents of California who purchased the Products for personal, family, or household purposes within the applicable statute of limitations ("California Consumer Subclass").

44. The foregoing classes are referred to collectively as the "Class" or "Classes."

45. The following people and entities are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendants,

Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

46.     This action is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

47.     **Numerosity:** Members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiffs but is likely to be ascertained by the Defendants' records.  At a minimum, there are likely at least tens of thousands of Class members.

48.     **Commonality:** There are questions of law and fact common to the proposed class(es). Common questions of law and fact include, without limitations:

    a.  whether reasonable consumers are likely to be deceived by the labeling of the Products;

    b.  whether Defendants' course of conduct alleged herein violates the statutes and other laws that are pled in this Complaint;

    c.  whether Defendants misrepresented material facts and/or failed to disclose material facts in connection with the packaging, marketing, distribution, and sale of the Products;

    d.   whether Defendants knew or should have known that their packaging, marketing, distribution, and sale of the Products were false or misleading;

    e.   whether Defendants were unjustly enriched by retaining monies from the sale of the Products;

    f.   whether certification of each Class is appropriate under Rule 23;

    g.   whether Plaintiffs and the members of each Class are entitled to declaratory, equitable, and/or other relief, and the scope of such relief; and

    h.   the amount and nature of the relief to be awarded to the Plaintiffs and the Classes.

49.    **<u>Typicality</u>:** Plaintiffs' claims are typical of the other Class members because Plaintiffs, as well as Class members, purchased the Products relying on the representation that the Products did not contain any artificial flavors or artificial preservatives prior to purchasing the Products. Plaintiffs and the members of each Class paid a price premium for Defendants' Products and would not have purchased them or would have paid substantially less for them had they known that the Products contained maltodextrin, a highly processed synthetic ingredient.

50.    **<u>Adequacy</u>:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Classes they seek to represent; their claims are common to all members of the Classes and they have a strong interest in vindicating their and all other Class members' rights. Plaintiffs have retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action through judgment and appeal, if necessary.

51. **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Complaint predominate over any other questions affecting only individual members of the Classes. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' misconduct detailed at length in this Complaint.

52. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Complaint/lawsuit. Further, because of the damages suffered by any individual Class member may be relatively modest in relation to the cost of litigation, the expense and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class members may be unaware that claims exist against the Defendants.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS**
**PRACTICES ACT ("ICFA") 815 ILCS 505/1, *et seq.***
*(On Behalf of the Illinois Class)*

53. Plaintiff Wilson repeats and realleges Paragraphs 1-52 as if fully set forth herein.

54. Plaintiff Wilson and the Illinois Class members desired to purchase a product that was made with "No Artificial Flavors" and "No Artificial Preservatives."

55. As alleged herein, the Products are falsely and deceptively labeled as free from artificial flavors and preservatives, yet contain maltodextrin, which is an artificial flavoring agent and an artificial preservative.

56.     Defendants' false and deceptive representations and omissions about the actual ingredients in the Products were material in that they influence consumer purchasing decisions.

57.     Plaintiff Wilson and the Illinois Class relied on the representations and omissions.

58.     Plaintiff Wilson and the Illinois Class members would not have purchased the Products or paid as much if the true facts had been known about them. As a result, they suffered damages.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
### *(On Behalf of the New York Class)*

59.     Plaintiff Eusebio repeats and realleges Paragraphs 1-52 as if fully set forth herein.

60.     New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

61.     The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff Eusebio and the New York Class seek monetary damages against Defendants.

62.     Defendants misleadingly, inaccurately, and deceptively advertise and market the Products to consumers.

63.     Defendants' improper consumer-oriented conduct – including labeling and advertising the Products as containing "No Artificial Flavors" and "No Artificial Preservatives" – is misleading in a material way in that it, *inter alia*, induced Plaintiff Eusebio and New York Class Members to purchase and pay a premium for Defendants' Products when

they otherwise would not have. Defendants made their misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

64. Plaintiff Eusebio and the New York Class have been injured inasmuch as they paid a premium for Products that were – contrary to Defendants' representations – made with maltodextrin, an artificial flavor and artificial preservative. Accordingly, Plaintiff Eusebio and the New York Class Members received less than what they bargained and/or paid for.

65. Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff Eusebio and the New York Class have been damaged thereby.

66. As a result of Defendants' "unlawful" deceptive acts and practices, Plaintiff Eusebio and the New York Class are entitled to monetary, compensatory, statutory, treble and punitive damages, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350**
*(On Behalf of the New York Class)*

67. Plaintiff Eusebio repeats and realleges Paragraphs 1-52 as if fully set forth herein.

68. New York General Business Law § 350 provides, in part, as follows: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

69. GBL § 350-a(1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account

18

(among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual. …

70.     Defendants' advertising of the Products as free from artificial flavors and artificial preservatives is a materially misleading representation inasmuch as the Products contain maltodextrin, which is an artificial preservative and an artificial flavoring agent, which affects consumers' decisions to purchase the Products.

71.     Plaintiff Eusebio and the New York Class have been injured inasmuch as they paid a premium for Products that were – contrary to Defendants' representations – made with maltodextrin, an artificial flavor and artificial preservative. Accordingly, Plaintiff Eusebio and the New York Class Members received less than what they bargained and/or paid for.

72.     Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

73.     Defendants' labeling of the Products induced Plaintiff Eusebio and the New York Class to buy Defendants' Products.

74.     Defendants made the "No Artificial Flavors" and "No Artificial Preservatives" representations willfully, wantonly, and with reckless disregard for the truth.

75.     As a result of Defendants' deceptive acts and practices, Plaintiff Eusebio and New York Class are entitled to monetary, compensatory, statutory, treble and punitive damages, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**VIOLATIONS OF BREACH OF EXPRESS WARRANTY (N.Y. U.C.C. § 2-313)**
*(On behalf of the New York Class)*

76.     Plaintiff Eusebio repeats and realleges Paragraphs 1-52 as if fully set forth herein.

77.     Plaintiff Eusebio brings this claim on behalf of himself and the New York Class for breach of express warranty under N.Y. U.C.C. § 2-313.

78.     Plaintiff Eusebio and members of the New York Class formed a contract with Defendants at the time they purchased the Products. As part of that contract, Defendants represented on the front label of the Products that the Products are made with "No Artificial Flavors" and "No Artificial Preservatives," thus warranting to consumers that the Products contained no ingredients which are classified as an artificial preservative or an artificial flavoring, despite the Products containing maltodextrin—a highly processed synthetic ingredient that imparts flavor and retards the deterioration thereof of other ingredients.

79.     These representations constitute an express warranty and become part of the basis of the bargain between Plaintiff Eusebio and members of the New York Class, on the one hand, and Defendants, on the other.

80.     Defendants made the representations to induce Plaintiff Eusebio and members of the New York Class to purchase the Products, and Plaintiff Eusebio and the New York Subclass relied on the representations in purchasing the Products.

81.     All conditions precedent to Defendants' liability under the above-referenced contract have been performed by Plaintiff Eusebio and the New York Class.

82.     Express warranties by a seller of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and

becomes the basis of the bargain. Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description.

83.     Defendants breached the express warranties about the Products because, as alleged above, the Products contain maltodextrin—an artificial flavor and artificial preservative.

84.     As a result of Defendants' breaches of express warranty, Plaintiff Eusebio and the New York Class members were damaged in the amount of the premium price they paid for the Products, in amounts to be proven at trial.

85.     In November 2024, Plaintiff Eusebio discovered this breach. On November 8, 2024, Plaintiff Eusebio, on behalf of himself and others similarly situated, sent a notice and demand letter to Defendants providing notice of their breach.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA")
### California Civil Code §§ 1750, *et seq*.
### (*On behalf of the California Consumer Subclass*)

86.     Plaintiff Patnude repeats the allegations contained in paragraphs 1-52 above as if fully set forth herein.

87.     Plaintiff Patnude brings this claim individually and on behalf of the members of the proposed California Consumer Subclass against Defendants.

88.     Defendants' conduct constitutes violations under the California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA").

89.     Defendants' conduct falls within the meaning of this statute because it caused transactions to occur resulting in the sale or lease of goods to consumers – namely, the sale of the Products. The Products are considered to be "goods" within the meaning of the statute under Cal. Civil Code 1761(a).

90. Plaintiff Patnude and members of the Classes are "consumers" pursuant to the statute.

91. Defendants violated the CLRA by way of the following provisions:

    a. Representing that the Products have "characteristics" (i.e., no artificial flavoring or preservatives) which they do not, in violation of Cal. Civ. Code § 1770(a)(5);

    b. Representing that the Products are of a particular "standard" (i.e., no artificial flavoring or preservatives) when they are not that standard, in violation of Cal. Civ. Code § 1770(a)(7); and

    c. Advertising the Products with the "intent not to sell [it] as advertised" in violation of Cal. Civ. Code § 1770(a)(9).

92. As the entity responsible for the manufacturing, labeling, and advertising of the Products, Defendants are aware that the representations that the Products contain "No Artificial Flavor" and "No Artificial Preservatives" are false and misleading and will mislead a reasonable consumer.

93. Due to Defendants' conduct, Plaintiff Patnude and members of the California Consumer Subclass suffered economic injury in that they paid more for the Products than they otherwise would have had they known the truth.

94. Pursuant to the provisions of Cal. Civ. Code § 1782(a), on June 24, 2024, Defendants received a letter via certified mail, return receipt requested, providing notice to Defendants of their alleged violations of the CLRA, and demanding that they correct such violations. The letter was sent on behalf of all purchasers of the Products during the class period. Because more than 30 days has passed since Defendants received the notice, and Defendants have yet to cure their violations, Plaintiff Patnude brings this claim for damages under the CLRA.

95. Plaintiff Patnude and members of the Classes therefore seek damages, injunctive relief, reasonable attorneys' fees and costs, and all other available relief as pleaded in this Complaint and available under the CLRA.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")
### California Business & Professions Code § 17500, *et seq*.
### (*On behalf of the California Classes*)

96. Plaintiff Patnude repeats the allegations contained in paragraphs 1-52 above as if fully set forth herein.

97. Plaintiff Patnude brings this claim individually and on behalf of the members of the proposed California Classes against Defendants.

98. The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

99. Defendants violated the FAL by publicly disseminating misleading and false advertisements for the Products through the labeling of the Products as containing "No Artificial Flavors" and "No Artificial Preservatives," when the Products contained maltodextrin.

100. Defendants' false and misleading representation was made in order to increase sales of the Products.

101. Plaintiff Patnude and members of the California Classes would not have bought the Products, or would have paid considerably less for them, had they known that the representations were false and misleading, and that the Products were made with maltodextrin—an artificial flavor and artificial preservative.

102.     Plaintiff Patnude and members of the California Classes seek an order requiring Defendants to: (a) make full restitution for all monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits.  Plaintiff Patnude also seeks all other available relief as pleaded in this Complaint.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**
**California Business & Professions Code § 17200,** *et seq.*
(***On behalf of the California Classes***)

103.     Plaintiff Patnude repeats the allegations contained in paragraphs 1-52 above as if fully set forth herein.

104.     Plaintiff Patnude brings this claim individually and on behalf of the members of the proposed California Classes against Defendants.

105.     Plaintiff Patnude and Defendants are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

106.     The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. Prof. Code § 17200.

107.     In the course of conducting business, Defendants engaged in "unlawful" business practices by violating 21 C.F.R. § 101.18(b), Cal. Civ. Code § 1770, Cal. Bus. & Prof. Code § 17500, and the other laws referenced herein.

108.     As a result of Defendants' unlawful business acts and practices, Defendants have and continue to unlawfully obtain money from Plaintiff Patnude and members of the California Classes.

109.     Defendants' foregoing business practices are also "unfair" under the UCL, which states that unfair acts are acts where the reasons, justifications and motivations of Defendants are outweighed by the harm to Plaintiff Patnude and other California consumers.

110.     A business practice is also considered to be "unfair" if the conduct alleged is immoral, unethical, oppressive, or substantially injurious to consumers; as well as if the

24

conduct alleged causes an injury which is not outweighed by any benefits to other consumers or to competition, and that the injury is of the type that the consumer could not have avoided. Defendants' conduct is "unfair" pursuant to the UCL under each of the three tests described in these paragraphs.

111. Defendants' behavior constitutes unfair business practices under California law.

112. Defendants' retention of Plaintiff Patnude and California Class member's payments for the Products outweighs the economic harm that said retention imposes on consumers. The only parties that benefit are Defendants. There is no benefit to deceiving consumers regarding the ingredients in the Products they are consuming, particularly when Defendants are charging a premium for this false perception. Defendants' sale of the Products with the "No Artificial Flavors" and "No Artificial Preservatives" statements discussed herein are immoral, unethical, oppressive, and substantially injures consumers.

113. As Defendants continue to unfairly retain Plaintiff Patnude and members of the California Classes' payments for the Products, this conduct continues to be unfair under California law. This is exactly the type of unscrupulous and inexcusable business practice that the UCL was enacted to address.

114. Defendants' representations are also "fraudulent" under the UCL because they have the effect of deceiving consumers into believing that the Products are comprised of only certain ingredients when they are not.

115. Defendants knew, or should have known, their material misrepresentation would be likely to deceive and harm the consuming public and result in consumers making payments to Defendants under the false impression about the Products.

116. As a result of Defendants' conduct, Plaintiff Patnude and members of the California Classes have suffered injury-in-fact by paying more for the Products than they otherwise would have. Plaintiff Patnude requests that the Court issue sufficient equitable relief

to restore her and members of the Classes to the position they would have been had Defendants not engaged in unfair business practices.

117.     Plaintiff Patnude and members of the California Classes seek an order requiring Defendants to: (a) make full restitution for all monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits.  Plaintiff Patnude also seeks all other available relief as pleaded in this Complaint.

**EIGHTH CLAIM FOR RELIEF**
**Breach of Express Warranty**
**Cal. Com. Code § 2313**
(*For the California Class*)

118.     Plaintiff Patnude repeats the allegations contained in paragraphs 1-52 above as if fully set forth herein.

119.     Plaintiff Patnude brings this claim individually and on behalf of the members of the California Class against Defendants for breach of express warranty under Cal. Com. Code § 2313.

120.     California's express warranty statutes provide that "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

121.     Defendants have expressly warranted on the Products' front packaging that the Products were made with "No Artificial Flavors" and "No Artificial Preservatives," thus warranting to consumers that the Products were free from artificial flavors or artificial preservatives, despite the Products containing maltodextrin, an artificial flavor and artificial preservative.

122.      The statements "No Artificial Flavors" and "No Artificial Preservatives" on the front of the Products are: (a) an affirmation of fact or promise made by Defendants to consumers

that the Products are free from artificial flavors and artificial preservatives; (b) became part of the basis of the bargain to purchase the Products when Plaintiff and other consumers relied on the representations; and (c) created an express warranty that the Products would conform to the affirmations of fact or promises. In the alternative, the representations about the Products are descriptions of goods which were made as part of the basis of the bargain to purchase the Products, and which created an express warranty that the Products would conform to the product descriptions.

123. Plaintiff Patnude and members of the California Class reasonably and justifiably relied on the foregoing express warranties, believing that the Products did in fact conform to those warranties.

124. Defendants have breached the express warranties made to Plaintiff Patnude and members of the California Class by failing to provide the Products made with "No Artificial Flavors" and "No Artificial Preservatives."

125. Plaintiff Patnude and members of the California Class paid a premium price for the Products but did not obtain the full value of the Products as represented. If Plaintiff Patnude and members of the California Class had known of the true nature of the Products, they would not have been willing to pay the premium price associated with them. As a result, Plaintiff Patnude and members of the California Class suffered injury and deserve to recover all damages afforded under the law. Defendants were provided notice of these violations on June 24, 2024.

**NINTH CLAIM FOR RELIEF**
**Breach of Implied Warranty**
**Cal. Com. Code § 2314**
**(*For the California Class*)**

126. Plaintiff Patnude repeats the allegations contained in paragraphs 1-52 above as if fully set forth herein.

127. Plaintiff Patnude brings this claim individually and on behalf of the members of the California Class against Defendants for breach of implied warranty under Cal. Com.

Code §2314.

128. California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

129. California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any." Cal. Com. Code § 2314(2)(f).

130. Defendants are merchants with respect to the sale of Products. Therefore, a warranty of merchantability is implied in every contract for sale of the Products to California consumers.

131. By advertising the Products' front labeling with the ""No Artificial Flavors" and "No Artificial Preservatives" representation, Defendants made an implied promise on the Products' labeling that the Products were free from artificial flavors and artificial preservatives. The Products, however, have not "conformed to the promises…made on the container or label" because the Products contain maltodextrin, an artificial flavor and artificial preservative. Plaintiff Patnude, as well as other California consumers, did not receive the goods as impliedly warranted by Defendants to be merchantable. Therefore, the Products are not merchantable under California law and Defendants have breached their implied warranty of merchantability in regard to the Products.

132. If Plaintiff Patnude and members of the California Class had known that the Products' "No Artificial Flavors" and "No Artificial Preservatives" representations were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Defendants' breach, Plaintiff Patnude and members of the California Class have suffered injury and deserve to recover all damages afforded under the law. Defendants were provided notice of these violations on June 24, 2024.

## TENTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### *(On behalf of Plaintiffs and the Classes)*

133. Plaintiffs repeat and reallege Paragraphs 1-52 as if fully set forth herein.

134. Plaintiffs bring this claim for unjust enrichment individually and on behalf of the Classes.

135. Plaintiffs and members of the Classes purchased Defendants' Products and paid a premium for the Products, as described in this Complaint. Defendants misrepresented that the Products were made with "No Artificial Flavors" and "No Artificial Preservatives" which commanded a price premium for the Products.

136. Defendants had knowledge of such benefit and obtained the benefit by their misrepresentation because that misrepresentation induced reasonable consumers to purchase the Products when they would not otherwise have purchased them or purchased them at the advertised price.

137. Defendants appreciated this benefit and knowingly accepted it at the expense of, and to the detriment of, Plaintiffs and the Classes. Defendants currently retain this benefit.

138. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants' misconduct detailed at length in this Complaint.

139. Equity cannot in good conscience permit Defendants to be economically enriched for such action at the expense of Plaintiffs and the Classes, and therefore restitution and/or disgorgement of such economic enrichment is required.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of other members of the proposed Classes, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

a. Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

b. A declaration or declaratory judgment that Defendants' conduct has violated and continues to violate the statutes and laws cited herein;

c. An order requiring imposition of a constructive trust and and/or disgorgement of Defendants' ill-gotten gains and to pay restitution to Plaintiffs and members of the Classes to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice;

d. An award of damages, including all available statutory and punitive damages, pursuant to the statutes and the causes of action pled herein;

e. An award of injunctive and other equitable relief as is necessary to protect the interests of Plaintiff Patnude and the California Class members, including, *inter alia*, an order prohibiting Defendant from engaging in the unlawful acts described above;

f. Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and applicable, to prevent Defendants from retaining the benefit of its wrongful conduct;

g. an award of all recoverable costs and expenses, including reasonable fees for Plaintiffs' attorneys; and

h. an award of pre- and post-judgment interest to Plaintiffs and members of each of the Classes if applicable; and, ordering further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs and members of the Classes demand a jury trial on all issues so triable.

DATED: December 13, 2024  **CUSTODIO & DUBEY, LLP**

      By: ___/s/ Robert Abiri_____

      Robert Abiri
      E-mail: abiri@cd-lawyers.com
      445 S. Figueroa Street, Suite 2520
      Los Angeles, CA 90071
      Telephone: (213) 593-9095
      Facsimile: (213) 785-2899

      *Attorneys for Plaintiffs and the*
      *Putative Classes*